UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

CITGO PETROLEUM CORPORATION,

    Plaintiff,

v.                                                              Case No.: 8:12-cv-00876-T-33MAP

MID-STATE ENERGY, INC. and
HIGHLANDS OIL CO., INC.,

    Defendants.
_____/

## ORDER GRANTING MOTION FOR PRELIMINARY INJUNCTION

This matter comes before the Court pursuant to Plaintiff CITGO Petroleum Corporation's Motion for Preliminary Injunction {Doc. # 7). For the reasons set forth below, the Court **GRANTS** the Motion for Preliminary Injunction.

**I.    Findings of Fact**

On the basis of CITGO's Verified Complaint (Doc. # 1), Motion for Preliminary Injunction (Doc. #. 7) and the declaration of Karl Schmidt (Doc. # 2-2), this Court finds as follows:

    1.    CITGO is a refiner and marketer of petroleum products, including a complete line of proprietary lubricants, oils and fluids for use in automobiles, trucks, heavy equipment and other industrial machinery.

    2.    CITGO markets its lubricant products under the "CITGO" name, the CITGO "Tri-Mark" trademark, and a number of registered trade names and marks including "CITGARD", "SUPERGARD" and "TRANSGARD," among others (collectively, the "CITGO Marks" or the "Marks").

3. Each of these products is engineered to meet certain industry standards and specifications set by SAE, ASTM, API or, in some cases, the manufacturer of a particular automobile or piece of equipment. In this regard, many of the products at issue here contain a proprietary blend of chemicals and additives designed to improve performance and to set CITGO's products apart from other products available in the marketplace.

4. The unique chemical composition of CITGO's various products creates, in effect, a chemical "fingerprint" that can be used to distinguish CITGO's products from the lower-cost, lower-quality products of its competitors.

5. MSE is a distributor of CITGO–brand lubricants under a "Lubricant Distributor Agreement" dated September 1, 1994 (the "LDA"), and a "Lubricant Packaging and Trademark Agreement" dated February 1, 1996 (the "LPTA").

6. Under these agreements MSE is allowed to repackage bulk lubricant products purchased from CITGO and to use the CITGO name and trademarks in connection with the resale of products purchased from CITGO – but no other products.

7. Historically, MSE purchased lubricant products in bulk from CITGO, typically via tanker truck. It then repackaged that bulk product in either five-gallon buckets or 55-gallon drums; branded the buckets or drums with labels bearing the CITGO trademarks; and sold the CITGO-branded buckets and drums at retail to end users (typically trucking and construction firms, farmers and other industrial customers).

8. By letter dated March 13, 2012, CITGO was informed by a representative of the Independent Lubricant Manufacturers' Association ("ILMA") that a sample of TRANSGARD Tractor Hydraulic Fluid ("THF") randomly (and anonymously) purchased

from MSE on September 30, 2011, had failed to meet CITGO's stated performance representations and industry specifications for product quality.

9. ILMA is an independent trade association of lubricant manufacturers (including CITGO) that, among other things, is tasked with monitoring and testing the quality of lubricants for sale in the market. Because low-quality, low-cost alternative products have become readily available in the wholesale market, ILMA and other watchdog groups have instituted programs whereby they purchase packaged lubricants, oils and other fluids from randomly selected retailers to test for compliance with the product specifications and representations made on the package's label.

10. In this case, ILMA happened to purchase CITGO-branded TRANSGARD THF from MSE, and when that product was tested in the laboratory it failed to meet the relevant specifications.

11. The ILMA testing also showed that the sampled product did not match the chemical profile of the TRANSGARD THF that CITGO manufactures. Not only did the tested product not match the chemical "fingerprint" for CITGO's TRANSGARD THF, it didn't meet the basic industry standard for tractor hydraulic fluid at all.

12. After receiving this information from ILMA, CITGO then checked its records of sales to MSE and found that MSE had not purchased *any* TRANSGARD THF from CITGO since 2008, when it had purchased 2,500 gallons in bulk. CITGO also learned, however, that MSE had obtained CITGO packaging labels for TRANSGARD THF from a CITGO vendor as recently as February 2012, and that since 2008 it had acquired enough packaging labels to brand almost 10,935 gallons of product.

13. After making these discoveries, CITGO promptly hired an independent ASTM accredited product testing firm, Intertek USA, Inc., to purchase and test additional samples of the full range of CITGO products sold by MSE. Intertek thereafter arranged for anonymous "secret shoppers" to go to MSE's retail store, on two separate occasions, to purchase a total of 10 different products that MSE had repackaged and labeled with the CITGO Marks:

   a. CITGARD 600 SAE 15W-40 Motor Oil—one five-gallon bucket;

   b. SUPERGARD 10W-30 Motor Oil—one 55-gallon drum;

   c. CITGO EP Compound 150—one five-gallon bucket;

   d. CITGO EP Compound 220—one five-gallon bucket;

   e. CITGO Pacemaker T-32—one five-gallon bucket;

   f. CITGO Pacemaker T-68—one five-gallon bucket;

   g. TRANSGARD HD 30 Transmission Fluid—two five-gallon buckets;

   h. A/W-32 Hydraulic Oil—one five-gallon bucket;

   i. TRANSGARD Tractor Hydraulic Fluid—one five-gallon bucket; and

   j. Gear Oil 80W-90 —one five-gallon bucket.

14. Samples of each of these products were then sent to CITGO's Petroleum Lubricants Quality Control Testing Laboratory in Cicero, Illinois, for chemical analysis, with additional confirmatory testing performed at Intertek's independent laboratory.

15. The results of those two sets of tests showed that at least <u>five of the 10</u> products repackaged and sold by MSE under the CITGO brand were not CITGO products. The five products that failed to match CITGO's specifications and chemical formulation

were CITGARD 600 SAE 15W-40 Motor Oil; SUPERGARD 10W-30 Motor Oil; CITGO EP Compound 220; A/W-32 Hydraulic Oil; and TRANSGARD THF.

16. As with the TRANSGARD THF product identified by ILMA, the available information regarding MSE's purchase history and label use for certain of these additional off-specification products also serves to confirm that the products being sold by MSE under the CITGO brand were not products supplied by CITGO in the first instance. For example:

* MSE had not purchased any CITGARD 600 15W-40 Engine Oil in bulk from CITGO since February 2005, yet it had printed packaging labels for that product as recently as April 2012;

* MSE had not purchased any SUPERGARD 10W-30 in bulk since March 2008 but it printed packaging labels in April 2012;

* MSE had not purchased any A/W-32 Hydraulic Oil in bulk since March 2008 but it printed packaging labels in February 2012;

* MSE had not purchased any EP Compound 220 in bulk since January 2008 but it ordered packaging labels in January 2012.

17. In short, MSE has printed or ordered labels for quantities of product far in excess of what it actually purchased from CITGO over the past several years. Its recent label use and its purchase history are incompatible.

**II. Conclusions of Law**

In light of the foregoing Findings of Fact, the Court further finds as follows:

1. CITGO has demonstrated a reasonable likelihood that it will succeed on the merits of its claims against MSE, including its claim that MSE infringed upon CITGO's

trademarks by packaging non-CITGO products in containers bearing CITGO Marks; claims that such acts constitute false advertising, unfair competition and trademark counterfeiting; claims for breach of contract; and claims for unfair and deceptive trade practices under state law.

2. CITGO has no adequate remedy at law and will suffer irreparable harm absent a preliminary injunction. "Trademark infringement by its nature causes irreparable harm." *Levi Strauss & Co. v. Sunrise Int'l Trading, Inc.*, 51 F.3d 982, 986 (11th Cir. 1995). The injuries CITGO faces include consumer confusion and the loss of reputation from the sale of substandard products under the CITGO brand. "A plaintiff need not show that the infringer acted in such a way as to damage the reputation of the plaintiff. It is the loss of control of one's reputation by the adoption of a confusingly similar mark that supplies the substantial threat of irreparable harm." *Ferrellgas Partners, L.P. v. Barrow*, 143, F. App'x 180, 191 (11th Cir. 2005).

3. MSE will not be harmed by the issuance of a preliminary injunction. While a preliminary injunction will prevent MSE from continuing to use CITGO's marks and thus may result in a loss of revenue, any such purported losses are inapposite. *See Clayton v. Howard Johnson Franchise Systems*, *Inc.*, 730 F. Supp. 1553, 1561-62 (M.D. Fla. 1988) ("In contrast, [Defendant] would suffer no legitimate harm since the preliminary injunction would only prevent them from using marks which they are not entitled to use.").

4. The public interest will be served by the issuance of a preliminary injunction. Specifically, a preliminary injunction will help insure that consumers are not deceived by the improper branding of products. "[T]he public interest is served by preventing consumer

confusion in the marketplace." *Davidoff & CIE, S.A. v. PLD Int'l Corp.*, 263 F.3d 1297, 1304 (11th Cir. 2001).

5.  CITGO is not required to post a bond. Federal Rule of Civil Procedure 65(c) conditions the issuance of a preliminary injunction or temporary restraining order on "the movant giv[ing] security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined." However, "the amount of security required by the rule is a matter within the discretion of the trial court ...[, and] the court may elect to require no security at all." *BellSouth Telecomm., Inc. v. MCIMetro Access Transmission Servs., LLC*, 425 F.3d 964, 971 (11th Cir. 2005). The Court determines that CITGO need not post a bond due to its size and financial resources. CITGO is a Fortune 500 company; there is no reasonable basis for concern that CITGO could not satisfy any judgment that might ultimately be entered in this case. *See Burger King Corp. v. Duckrey*, --- F. Supp. 2d ---, 2011 WL 6937384, at *7 (S.D. Fla. 2011) (waiving bond requirement given the financial status of Burger King, a Fortune 1000 company).

### III.  Preliminary Injunction

Accordingly, it is hereby **ORDERED** that Defendants Mid-State Energy, Inc. and Highlands Oil Co., Inc. (together "MSE") and their officers, agents, servants, employees, attorneys, successors and assigns and all persons in active concert or participation with any of them, individually or collectively, be enjoined from:

1.  Selling or offering for sale any lubricant products in five-gallon buckets or 55-gallon drums bearing a label with any CITGO trademark or the CITGO name;

2.  Using CITGO's mark, or any other name or mark likely to cause confusion

7

with CITGO's marks, in connection with the sale of any lubricant products sold in five-gallon buckets or 55-gallon drums;

3. Doing any other act or thing likely to confuse, mislead or deceive others into believing that MSE's non-CITGO products emanate from, or are connected with, sponsored by or approved by CITGO;

4. Destroying any false advertisements or counterfeit or infringing goods, labels, signs, prints, packages, wrappers, receptacles, advertisements or other printed materials bearing the CITGO marks or any reproduction, counterfeit, copy or colorable imitation of them; and

5. Assisting, aiding or abetting any person or entity in engaging in any of the activity prohibited in paragraphs 1 through 4 above.

It is further **ORDERED** that, to the extent MSE has not already done so pursuant to the terms of the Court's previously-issued Order (Doc. #. 6):

1. MSE shall be required to quarantine all counterfeit and infringing products, and goods, labels, signs, prints, packages, wrappers, receptacles, advertisements or other materials in MSE's possession bearing the CITGO mark or any reproduction, counterfeit, copy or colorable imitation of them.

2. MSE shall be required to quarantine any labels hearing CITGO's marks that is has obtained from CITGO or a third-party vendor;

3. MSE shall be required to quarantine any lubricant products repackaged in five-gallon buckets or 55-gallon drums that currently bear CITGO's marks.

4. MSE shall be required to file with this Court and serve on CITGO a report in

writing under oath setting forth in detail the manner and form in which they have complied with the terms of the injunction entered by this Court, in accordance with 15 U.S.C. § 116(a).

This Order shall take effect immediately and shall continue in effect until an order by this Court dissolving or modifying this Order.

**DONE** and **ORDERED** in Chambers, Tampa, Florida, this 4th day of May, 2012.

_____
VIRGINIA M. HERNANDEZ COVINGTON
UNITED STATES DISTRICT JUDGE

Copies to:

All Parties and Counsel of Record